LISA J. YANG, ESQ. (SBN 208971)
Lisa.yang@limnexus.com
YIDU SUN, ESQ. (SBN 346430)
Yidu.sun@limnexus.com
**LIMNEXUS LLP**
707 Wilshire Boulevard, 46th Floor
Los Angeles, California 90017
Phone: (213) 955-9500
Facsimile: (213) 955-9511
Attorneys for Plaintiff
MAGU CORPORATION, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF

# CALIFORNIA SOUTHERN DIVISION

| | |
|---|---|
| MAGU CORPORATION, INC., a California corporation,<br><br>    Plaintiff,<br><br>    vs.<br><br><br>JAMES KIM, an individual; FEEL KALM, LLC, a California limited liability company; DOES 1-10,<br><br>    Defendants. | Case No. 8:25-cv-00948<br><br>**COMPLAINT FOR:**<br><br>1. Trademark Infringement in Violation of Section 32 of the Lanham Act<br><br>2. False Advertising in Violation of Section 43(a) of the Lanham Act<br><br>3. False Designation of Origin and Unfair Competition in Violation of Section 43(a) of the Lanham Act<br><br>4. Unregistered Trademark Infringement in Violation of Section 43(a) of the Lanham Act<br><br>5. Common Law Trademark Infringement<br><br>6. Breach of Fiduciary Duty for Failure to Use Reasonable Care<br><br>7. Breach of Fiduciary Duty of Loyalty<br><br>8. Misappropriation of Trade Secrets<br><br>9. Conversion<br><br>10. False Advertising in Violation of Cal. |

LIMNEXUS LLP

**COMPLAINT**



Bus. & Prof. Code § 17500 et seq.

11. Unfair Competition in Violation of Cal.
    Bus. & Prof. Code § 17200 et seq.

12. Unfair Competition under Common
    Law

13. Common Count

**DEMAND FOR JURY TRIAL**

LimNexus LLP

**COMPLAINT**

LIMNEXUS LLP

1    Plaintiff MAGU CORPORATION, INC. ("Plaintiff" or "Magu"), by and

2  through its counsel, hereby brings its complaint against Defendant JAMES KIM

3  ("Defendant Kim" or "Mr. Kim"), and FEEL KALM LLC, a California limited

4  liability company ("FeelKALM"), and allege as follows:

5                              **OVERVIEW**

6    1.    This case is not a simple dispute between business partners. Rather, this

7  case is a story of two friends who once shared a single vision that has now been

8  trampled. Plaintiff Magu Corporation, Inc. ("Magu") is the California corporation

9  formed by Ryan Morimoto ("Mr. Morimoto") with his friend, collaborator, and

10 business partner Defendant James Kim ("Mr. Kim") serving as its CEO, Vice

11 President, and most importantly Co-Founder. Magu was the embodiment of their

12 desire to help with people's health and wellbeing.

13   2.    Tensions arose between Mr. Morimoto and Mr. Kim as the roots of

14 their business and its responsibilities became entangled, arguments erupted, and

15 their friendship eroded. Mr. Morimoto's personal and professional boundaries have

16 been crossed. Even so, Mr. Morimoto wanted to try and make sure, for both Magu's

17 and their friendship's sake, that Mr. Morimoto and Mr. Kim could find a way to

18 move forward.

19   3.    Unfortunately, there was no way forward together. Without warning,

20 Mr. Kim, amongst other wrongful actions, locked Mr. Morimoto's access from

21 Magu's important business tools, created a new brand called FeelKALM, and began

22 selling Magu's inventory under the new brand, falsely claiming to Magu's

23 customers that Magu has rebranded. Mr. Kim's actions completely caught Magu and

24 Mr. Morimoto by surprise as it felt like a malicious effort to completely absorb and

25 uproot what Mr. Morimoto and Mr. Kim built together in Magu.

26   4.    At this point, Mr. Morimoto's business relationship and friendship with

27 Mr. Kim became no longer salvageable. Unfortunately, Mr. Morimoto had no

28

**COMPLAINT**

1  choice than to file this Complaint to enjoin Mr. Kim from further wrongful actions

2  harming Magu.

3                                          **PARTIES**

4          5.      Plaintiff MAGU CORPORATION, INC. ("Magu') is, and at all

5  relevant times, was a California corporation with its principal place of business in

6  Long Beach, California. Magu sells herbal supplements and nutritional supplements

7  online across the United States with its core market in California.

8          6.      Defendant JAMES KIM ("Mr. Kim") is, and at all relevant times, was

9  an individual residing in the county of Orange County, California. Mr. Kim was

10 formerly Magu's Vice-President, CEO, and Co-Founder of Magu.

11         7.      Defendant Feel Kalm, LLC ("FeelKALM") is, and at all relevant times,

12 was a California limited liability company with its principal place of business in

13 Sacramento, California. Defendant FeelKALM was formed by Defendant Mr. Kim.

14                          **JURISDICTION AND VENUE**

15         8.      This Court has subject matter jurisdiction over the first four causes of

16 action in this action under 28 U.S.C. § 1331, in that they are based on federal

17 trademark law which are the laws of the United States.

18         9.      This Court has supplemental subject matter jurisdiction over the other

19 nine causes of action in this action under 28 U.S.C. § 1367, as these nine causes of

20 action are related to the first four claims and are based on the same body of facts in

21 the action within this Court has original jurisdiction and that they form part of the

22 same case or controversy.

23         10.     The Court has personal jurisdiction over Defendant Mr. Kim because

24 he, at the time of the wrongful acts described herein that caused harm to Magu, was

25 working at Magu which is a corporation based in Los Angeles County, California

26 and should reasonably expect their actions to have consequences within this District.

27         11.     The Court has personal jurisdiction over Defendant FeelKALM

28 because it, at the time of the wrongful acts described herein that caused harm to

LIMNEXUS LLP

2
**COMPLAINT**

1  Magu, was conducting its primary business in Los Angeles County, California and

2  should reasonably expect its actions to have consequences within this District.

3      12.    Pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), venue is proper in this

4  Court because a substantial portion of the acts and omissions giving rise to the claim

5  occurred in this judicial district.  Furthermore, a substantial part of the events giving

6  rise to the claims alleged in this Complaint occurred in Los Angeles County,

7  California. As such, the Western Division of the Central District of California is the

8  proper intradistrict assignment for this case.

9                          **GENERAL FACTS**

10      13.    Magu is a California corporation that specializes in selling hemp-based

11  health and nutritional supplements. Currently as of the date of this Complaint, Magu

12  has launched two products, "White Sunrise" and "Mindhack" (collectively,

13  "Products")

14      14.    Magu was founded by two co-founders Ryan Morimoto and Defendant

15  James Kim on January 1, 2023.

16      15.    Mr. Morimoto and Mr. Kim met in college and they were part of the

17  same fraternity. They developed a good relationship during their time in college.

18  After graduating from college, Mr. Morimoto and Mr. Kim reconnected in 2021

19  when Mr. Morimoto was running his own consulting business.

20      16.    In 2022, Mr. Morimoto and Mr. Kim first developed their business

21  relationship when Mr. Morimoto consulted Mr. Kim on a real estate project that

22  lasted over six months. During this time, Mr. Morimoto was already involved in

23  research and development with others to develop hemp-based health and nutritional

24  supplements.

25      17.    By the end of Mr. Morimoto's consulting engagement with Mr. Kim,

26  Mr. Morimoto had already developed sample products and was discussing a new

27  method of delivering hemp-based products to the market with other people.

28

LimNexus LLP

**COMPLAINT**

18.     Mr. Morimoto mentioned this endeavor to Mr. Kim. Eventually, Mr. Morimoto let Mr. Kim try the sample products. Mr. Kim indicated that he liked the products and expressed to Mr. Morimoto that he was interested in working with Mr. Morimoto on these products.

19.     Mr. Morimoto considered this proposal and because of their relationship since college and experience with working with Mr. Kim on the prior real estate project, Mr. Morimoto decided to accept Mr. Kim's proposal and decided to work with him on these hemp products sometime in December 2022. With this decision to collaborate, Magu was born out of the desire of two friends who wanted to work on something they both believed in.

20.     Mr. Morimoto and Mr. Kim mutually decided to have Mr. Kim serve as Magu's CEO and Vice-President. Mr. Morimoto is the sole shareholder of Magu. Mr. Kim was never a shareholder of Magu and never had equity in Magu.

21.     Mr. Morimoto holds a chemical engineering degree with a business minor and has experience in various engineering roles such as validation engineer, quality engineer, manufacturing engineer, and plant manager in the consumer goods and food packaging industries.

22.     This background helped Mr. Morimoto understand the chemistry behind how hemp components interact with the body and apply biochemistry knowledge to explain product workings. Mr. Morimoto's professional background was in quality and manufacturing engineering, as well as plant management. Mr. Morimoto also utilized Design of Experiments to validate products, combining their engineering experience with validation and quality processes. His expertise in food and beverage packaging, food safety, and good manufacturing practices were beneficial for MAGU. Additionally, his experience in start-up and plant management provided valuable insights into product development, business operations, financial management, and customer relationships. Before forming Magu, Mr. Morimoto spent two years running his own consulting business.

23.    Mr. Kim's professional background was in customer service and sales, specifically regarding glucose medical devices.

24.    Mr. Morimoto and Mr. Kim worked on Magu together handling different responsibilities.

25.    Mr. Morimoto's responsibilities included: researching and developing the Products including its formulas which Mr. Morimoto developed, created, and finalized, manufacturing the Products, conducting quality control of the Products, communicating with third party collaborators such as famers and other vendors, ordering the supplies, raw materials, and ingredients to create the Products, managing Magu's bank accounts and finances, managing Magu's inventory, packaging of the Products, handling Magu's operations and logistics, handling legal matters, and providing support with marketing and sales if Mr. Kim needed.

26.    Mr. Kim's responsibilities included: developing marketing materials, including marketing copy on Magu's original website, in collaboration and approval of Mr. Morimoto, maintaining Magu's original website which the domain is owned by Mr. Morimoto/Magu, handling the development of the majority of the graphic design and trade dress in collaboration, assistance, and approval of Mr. Morimoto, managing Magu's social media and content creation, fulfilling orders from customers, acting as the primary customer service representative, and leading the sales team.

27.    Magu developed two different hemp-based health and nutritional supplements. These Products were called "White Sunrise" and "Mindhack". "White Sunrise" was launched in May 2023 and "Mindhack" was launched in December 2023.

28.    Since Magu was formed, Mr. Morimoto's then girlfriend, turned fiancé, and now wife, Lily Morimoto ("Mrs. Morimoto") aided Magu by helping out Mr. Morimoto and Mr. Kim as an extra set of hands when they needed it. Mrs. Morimoto provided assistance by: conducting sales calls, assisting Mr. Morimoto

1    with manufacturing and packing of the Products, assisting Mr. Morimoto with

2    operations and logistics, and taking on extra tasks and responsibilities when Mr.

3    Morimoto or Mr. Kim needed her to. Mr. Kim had no problem with nor had any

4    objections to Mrs. Morimoto helping them.

5          29.    Magu never gave Mrs. Morimoto any salary and equity in Magu for the

6    assistance she provided. In fact, Mrs. Morimoto never wanted to accept any salary

7    or equity. She never wanted to be a business partner to Mr. Morimoto and Mr. Kim

8    in Magu and never wanted to have any role, whether as a corporate officer or

9    employee, at Magu. Mrs. Morimoto helped Magu, and by extension Mr. Morimoto

10   and Mr. Kim, out of her pure desire to support her husband Mr. Morimoto and his

11   dreams with Magu.

12         30.    Mrs. Morimoto was the one who came up with the name "MAGU".

13   Magu applied to register and trademark the word mark "MAGU" ("Magu Word

14   Mark") on October 09, 2023, and the Magu Word Mark was registered on

15   November 26, 2024, with the US Serial Number of 98214808 and US Registration

16   Number of 7576413. The certificate of registration for the Magu Word Mark is

17   attached hereto as **Exhibit A**.

18         31.    Alongside the Magu Word Mark, Magu developed additional

19   unregistered trademarks which included the names of the Products: "White Sunrise"

20   and "Mindhack" (collectively, "Product Marks"), the tree design that is

21   implemented in the Products labels and packaging which has become integral to the

22   brand and image of Magu ("Magu Tree Mark"), Magu's specific color scheme

23   (Logo/Green Box: Green: #5e7467, Black: #050505, White: #f8f5ee; White Sunrise:

24   Green: #527466, White: #ffffff, Black: #222222; Mindhack: Gray: #a1a1a1, White:

25   #ffffff, Black: #08080a), and the trade dress the Products are packaged, sold, and

26   delivered in ("Magu Trade Dress") (collectively, "Unregistered Marks"). Magu still

27   currently uses these Unregistered Marks today. The "White Sunrise" mark was

28   created by Mr. Morimoto and the "Mindhack" was created by Mr. Kim. All

LIMNEXUS LLP

Unregistered Marks were developed after Magu was formed, while Mr. Kim was working at Magu, and was intended to be owned and used by Magu. Specimens of the Unregistered Marks are attached hereto as **Exhibit B**. Hereinafter, Magu Word Mark and the Unregistered Marks shall be collectively referred to as "Magu's Marks".

## FACTUAL ALLEGATIONS

32.    The first hints of problems began appearing in October 2024. Mr. Kim informed Mr. Morimoto that he needed to start withdrawing cash from Magu as he was out of money. Mr. Morimoto told him that having a W-2 salary was not financially feasible for Magu at the time but agreed that both of them could take some cash payments out of Magu at the end of the month, which totaled approximately $2,600 per month for Mr. Kim.

33.    Mr. Kim stated that he needed to take more cash from Magu in October 2024 as his savings were in critical condition and his withdrawals are necessities. Beginning in October 2024, Mr. Kim began withdrawing from Magu approximately $5,600 per month for the remainder of the year, to which Mr. Morimoto consented.

34.    Around this time, Mr. Morimoto began to notice changes in how Mr. Kim communicated with him regarding Magu related matters, disagreements between them increased, and Mr. Kim began acting without or against Mr. Morimoto's permission. For example, Mr. Kim hired his friend to work at Magu and withdrew cash from Magu's accounts to pay that friend without consulting Mr. Morimoto about the hiring nor where the money would come from. That friend only ended up working at Magu for a few days before quitting.  From this time onward, Mr. Kim continued to cause disagreements, arguments, and friction over hiring and payments of salary and equity to his friends on Magu's dime.

35.    Also in October 2024, Mr. Kim spent unnecessary funds on ordering subpar lids for Magu products, despite Mr. Morimoto having procured quality lids, as was Mr. Morimoto's responsibility.  When confronted with having spent

unnecessary funds belonging to Magu for subpar lids, Mr. Kim simply said that money is just money and insisted the lids he ordered looked better, despite them being subpar.

36.    Also in October 2024, Mr. Morimoto and Mr. Kim discussed relocating to Magu to Colorado due to its hemp-friendly regulations. Mr. Morimoto wanted to plan ahead and explore the logistics and legal considerations before making the move. Mr. Kim on the other hand dismissed the need for any real planning, saying the process was simple as finding a building, pack equipment, find a delivery truck, and unpack the delivery truck. Mr. Kim caused continuous friction and conflict between himself and Mr. Morimoto, and later involving Mrs. Morimoto, by criticizing and refusing to cooperate with Mr. Morimoto's selection of various cities as candidates for the relocation and calling Mr. Morimoto's choices "stupid".

37.    In November 2024, Mr. Kim created additional conflict between himself and Mr. Morimoto by demanding unnecessary purchases of inventory which impaired Magu's cash flow. Mr. Kim began to openly question Mr. Morimoto's logic on Magu business decisions, criticizing Mr. Morimoto's financial decisions.

38.    It was around this time that Mr. Kim told Mr. Morimoto that he unilaterally decided to increase Magu's monthly spending on advertisements by 50% without Mr. Morimoto's consent. Later in the month, Mr. Kim purchased, using Magu's credit card, a new graphics card and computer parts, claiming they were necessary to help him work. These purchases were made without any notice or discussion with Mr. Morimoto and they created additional cash flow problems for Magu.

39.    In December 2024, Mr. Morimoto learned that Mr. Kim handled certain customer service issues unprofessionally, using offensive remarks and personal attacks against a customer critical of Magu. Mr. Morimoto got involved in resolving a customer conflict, with which resolution Mr. Kim was disgruntled.

40.    In December 2024, Mr. Kim withdrew cash from Magu's accounts beyond those allotted to him, without Mr. Morimoto's permission, despite being informed that Mr. Kim's increase in advertising spending has caused Magu to go into a negative cash flow.  Mr. Kim caused additional conflict between himself and Mr. Morimoto by insisting on spending money Magu did not have, and calling Mr. Morimoto's suggestion to slow down as "weak and slow".

41.    During the same conversation, Mr. Kim notified Mr. Morimoto of his intent to attend Acquisition.com's marketing event which Mr. Morimoto has already repeatedly rejected as Magu couldn't afford to pay in excess of $12,000 for the ticket to the event. Mr. Kim assured Mr. Morimoto that he would personally cover the ticket costs.  Mr. Morimoto agreed to reconsider covering half of the cost for the ticket if Magu's financial conditions improved.  They did not.  Thus, Mr. Morimoto understood that Mr. Kim would personally cover the cost of attendance if he wanted to attend.  Then, unbeknownst to Mr. Morimoto and without his consent, Mr. Kim charged Magu's credit card $6,250.00, which was half of the marketing event's ticket price.  Additionally, Mr. Kim took out unauthorized cash withdrawals totaling $5,575.00 that were not disclosed to Mr. Morimoto or Magu.

42.    Starting in the year 2025, Mr. Morimoto noticed that Mr. Kim began to heavily intrude on Mr. Morimoto's professional and personal boundaries. Mr. Kim was responsible for Magu's marketing and advertising, but began dumping marketing and advertising responsibilities such as creating long-form video content, podcasts, creating short form video content from previous video content, and using editing applications, on Mr. Morimoto.  When Mr. Morimoto reluctantly agreed to handle some of Mr. Kim's tasks, Mr. Kim relentlessly micromanaged and criticized Mr. Morimoto's performance of Mr. Kim's tasks, creating increasing conflict between them.

43.    In addition to attacking Mr. Morimoto's business decisions, Mr. Kim also began attacking Mrs. Morimoto by claiming that Mr. Morimoto's work ethic

was getting weak like his wife's and that Mr. Morimoto was degrading into a weak person with his wife's work ethic by making weak decisions. This was the first time Mr. Kim expressed his dissatisfaction with Mrs. Morimoto working at Magu. Mr. and Mrs. Morimoto were both deeply hurt by these comments, which caused an argument between them and Mr. Kim. Eventually Mr. Kim apologized for making those remarks and acknowledged that Magu needed Mrs. Morimoto as she was the "third leg to the stool".

44. Starting in January 2025, Mr. Kim's complaints to Mr. Morimoto regarding relocation plans for Colorado became increasingly contentious, combative, and critical. Mr. Kim flip-flopped on whether to locate to Colorado or Texas (based on his personal goal of one day living in Texas), delaying decision-making necessary to effectuate the relocation of Magu. Mr. Kim also began to intrude on Mr. and Mrs. Morimoto's personal decisions, including where they wanted to live, criticizing and belittling the Morimotos' values and decisions on the personal aspects of their lives.

45. Mr. Kim's intrusion on the Morimotos' personal decisions were so severe that it caused Mr. Morimoto to question the practicality of a Colorado relocation. Then Mr. Kim called Mr. Morimoto, yelled and cussed at him for pausing the Colorado move, berated Mr. Morimoto, then then proceeded to attack Mr. Morimoto and Mrs. Morimoto, saying she would ruin his life in 30 years and that was making Mr. Morimoto broke and weak. He further stated that he never wanted to "work with her, see her, or hear about her again, end of discussion". Mr. Morimoto informed Mr. Kim that these comments were completely out of line, they were the exact kinds of disrespect that he had been talking about, and demanded that this behavior stop immediately. Mr. Kim's behavior also caused Mrs. Morimoto to significantly decrease her role in helping Magu, which resulted in a loss of manpower for Magu.

**COMPLAINT**

46.     After this incident, Mr. Kim started to take over Mr. Morimoto's responsibilities without his consent, making unilateral decisions including engaging in R&D and manufacturing, making large bulk purchases, requesting new flower strains, requesting farmers to harvest the hemp flowers in an impossible way, directly communicating with the suppliers and farmers, giving instructions to suppliers, and making his own orders. All of these were Mr. Morimoto's responsibilities that Mr. Kim overrode without authority or consent. One of Magu's suppliers received mixed requests and the conflicting instructions caused confusion, leading to an order mix up, which required time, energy, and money to resolve, all to Magu's detriment.

47.     Starting in February 2025, Mr. Kim began asking in depth questions regarding business operations and the manufacturing process, such as the specific manufacturing temperature required to create Magu's Products, which were areas that Mr. Kim was not involved in. By asking these questions, Mr. Morimoto realized Mr. Kim did not understand the manufacturing process at all and found Mr. Kim's inquiry into those details to be sudden as Mr. Kim had never shown interest in them before. Mr. Kim pressured Mr. Morimoto to answer these under the guise that he needed to know to help improve Magu. Mr. Morimoto answered them in good faith, assuming Mr. Kim genuinely wanted to learn and help.

48.     Mr. Morimoto initiated conversations to try to salvage the business relationship with Mr. Kim, and by setting boundaries. However, the conflicts between Mr. Kim and Mr. Morimoto continued despite Mr. Morimoto's continued requests that Mr. Kim maintain professional and personal boundaries, due to Mr. Kim's refusal to acknowledge these requests.

49.     On or about February 9, 2025, Mr. Kim informed Mr. Morimoto that he "accidentally" removed Mr. Morimoto from Magu's Google Business ad profile.

50.     On or about February 10, 2025, Mr. Morimoto had his final in person meeting with Mr. Kim. Mr. Morimoto confronted Mr. Kim about charging Magu's

**COMPLAINT**

credit card for unauthorized expenses, to which Mr. Kim continued to downplay and question Mr. Morimoto's decisions and boundaries. During this meeting, Mr. Kim proposed to explore him buying out Mr. Morimoto. Mr. Kim mentioned that he wanted to split the business in some way, offered Mr. Morimoto $60,000.00 plus interest without any clear payout structure, and he wanted to know what the current debts are. Mr. Morimoto said he was open to hearing him out but wanted a concrete written proposal, which had to make financial sense, that he preferred to continue to work together, and he wanted Magu to succeed. Mr. Kim agreed that he wanted to keep working together and keep Magu running.

51.     On or about February 11, 2025, Mr. Morimoto sent Mr. Kim a follow-up email recapping the buyout decision alongside information about Magu's debts as requested. Mr. Kim responded with concerns and justifications of wanting to split the business, misrepresenting Mr. Morimoto's boundaries, the discussions they had, and followed up with two vague buyout options, which included a twenty-four-hour ultimatum.

52.     On February 13, 2025, Mr. Morimoto woke up and discovered that Mr. Kim had effectively kicked and locked Mr. Morimoto out of Magu's website (magucorp.com) by preventing Mr. Morimoto from accessing the full website and infrastructure needed for its operation, including its website data, even though Mr. Morimoto owned Magu's website's domain. Mr. Kim also kicked and locked our Mr. Morimoto from Magu's order and payment processors and all business, social media, and advertising accounts and tools including: Square, Google Ads, Facebook Ads, and other ad accounts, Google account, including Google Shopping, and Google business profile, website related software such as WordPress, Cloudflare, WooCommerce, Sendinblue.com, Rocket, AffiliateWP, Trust Index, Mailchimp, and social media accounts including Facebook, YouTube, Instagram, and TikTok. Mr. Kim also took control of the AT&T accounts and phones which were used for customer communications, locking Mr. Morimoto out of customer messages and

call records. Mr. Morimoto not only lost access to these accounts and tools, but also lost access to the valuable data and information associated with them.

53.     Mr. Kim also locked Mr. Morimoto out of the software paid by Magu including Canva, Chat GPT, Adobe, Monday.com, Capcut, Grammarly, goto phone service, QR Code Generator, and shippo and engaged in the unauthorized use of those software.

54.     On the same day, Mr. Morimoto filed an incident report with the Fountain Valley Police Department regarding Mr. Kim's wrongful actions. The incident report number is #FVPD 25-04922.

55.     From February 13, 2025, until the filing of this Complaint, Mr. Kim added a banner to Magu's website saying that Magu has rebranded as FeelKALM and contacted all of Magu's customers that Magu has rebranded, telling everyone to visit their new website (feelkalm.com). Mr. Kim realized that he did not own the domain of Magu's website and thus had to create a new one for FeelKALM. Mr. Morimoto was completely unaware of FeelKALM and was not involved in the creation of FeelKALM.

56.     Mr. Kim has also stolen Magu's entire customer list, and customer data including their contact information, payment information, and other confidential and personal information. In addition, Mr. Kim has retained and stole Magu's company assets and equipment, including but not limited to an iPhone, computer, video camera and microphone, video recording lights, inventory, packaging materials, marketing materials, and other Magu assets and property. All recurring subscription orders Magu had were also taken and redirected by Mr. Kim to himself.

57.     Mr. Kim used Magu's customer contact information and personally communicated with customers telling them that Magu has rebranded into FeelKALM, that Mr. Morimoto and Mr. Kim parted ways due to difference in vision, that Mr. Kim took his split of the assets which included the formula and products themselves, falsely claiming that he came up with the formulas and

LimNexus LLP

Products, managed the manufacturing process, and they were his work, and directing everyone to communicate with and order from FeelKALM and him instead. Mr. Morimoto was the one who handled the manufacturing, research and development, and created the formulas. Mr. Kim is using these communications to spread disinformation, intentionally misleading Magu's customers.

58. Mr. Kim changed all of Magu's social media accounts to FeelKALM and started advertising for FeelKALM instead of Magu.

59. Mr. Kim began advertising Magu's products with the name KALM under FeelKALM both on FeelKALM's website and Magu's commandeered social media. The images used in the advertisements were photoshopped pictures of Magu's Products, replacing Magu's name and Magu Word Mark with KALM. These images are attached hereto as **Exhibit C**.

60. In actuality, Mr. Kim took the inventory he received from Magu containing Magu's Products and sold them as if they were FeelKALM's product under KALM, using the same names of "White Sunrise" and "Mindhack". Customers would receive orders of Magu's Products in the exact same Magu packaging and labels, using Magu's Marks, without any alterations, as evidenced by photographs taken by KALM's customers who order from Kalm, attached hereto as **Exhibit D**, which also includes a picture of Magu's Products as a comparison. Some customers also received products that had signs of tampering where the safety seals were broken, and some customers indicated that the product did not taste the same nor had the same efficacy.

61. By taking control of Magu's Square payment process account, Mr. Kim was able to redirect all of Magu's revenues and payments to his own account.

62. On or about February 21, 2025, Mr. Kim filed a new business entity called Feel Kalm, LLC to act as the corporate entity for his business.

63. On or about February 21, 2025, Mr. Kim sent Mr. Morimoto's father a letter explaining Mr. Kim's version of events that misrepresented the situation. Mr.

LimNexus LLP

Kim obtained Mr. Morimoto's father's information from Magu's customer list and data Mr. Kim took as he was Magu's customer.  In this letter, Mr. Kim falsely stated that: (i) Mr. Kim started covering the majority of work and that he was given an unequal split of the work, despite the list of extra responsibilities he had to cover were originally his responsibilities; (2) claimed that Mr. Morimoto's relationship with Mrs. Morimoto interfered with Magu and his responsibilities at Magu; (3) repeated the same misrepresentations of Mr. Morimoto's barriers, claiming them as new company rules and ignoring Mr. Morimoto's explanations; (4) claimed that Mr. Morimoto was the one who suggested Mr. Kim to buy him out when it was in fact Mr. Kim that suggested to buy Mr. Morimoto out; and (5) other claims such as misconstruing the events surrounding his phone call with Mr. Morimoto that Mrs. Morimoto overheard in January 2025 as Mr. Kim being the one attacked and misconstruing the conversation surrounding Mr. Kim's insistence regarding where Mr. and Mrs. Morimoto's move to Colorado.

64.    Mr. Kim not only sent this letter to Mr. Morimoto's father, but he read the letter verbatim in a YouTube video uploaded on Feb 20, 2025, on Magu's, now FeelKALM's, YouTube channel, and in that video, Mr. Kim again falsely claimed that he was the one who found the farmers, researched the chemicals, hand selected the plants, originally responsible day to day manufacturing,  developed the formula for "Mindhack", and put everything together. It was Mr. Morimoto who did those aforementioned tasks. This video was titled "Full Story about KALM and MAGU (What happened between KALM and MAGU)?" and was directed to Magu's customers to explain what happened. In actuality, Mr. Kim is using this video to spread disinformation, intentionally misleading Magu's customers.

65.    On or about February 27, 2025, Mr. Kim rebranded FeelKALM as "kalmherbs" but still maintained his new website domain as "feelkalm.com" and uses KALM to describe his company, brand, and products.

66.    Since February 13, 2025 until the filing of this Complaint, Mr. Morimoto has received several communications from both Magu's and FeelKALM's customers expressing (i) their confusion about Magu, FeelKALM, Magu's Products, and KALM's products, and the relationships between them; (ii) their confusion about Magu rebranding; (iii) their concern about the safety of their personal information and data; (iv) their broken trust in Magu as a brand and the quality of Magu's Products; and (v) their demands for refunds and/or cancellation of their subscriptions.

67.    Mr. Morimoto realized that he had to act quickly to counteract Mr. Kim's actions. Magu's move to Colorado has been postponed indefinitely due to Mr. Kim's actions. Although Mr. Morimoto owned and controlled the domain, he had no access to the original website data as Mr. Kim stole all the website data and assets and used it on FeelKALM's website. Effectively, Mr. Kim stole Magu's website, rebranded it, and Mr. Morimoto was forced to rebuild Magu's website from scratch. On March 3, 2025, Mr. Morimoto was able to resecure Magu's access to Trustpilot. As of the date of this Complaint, Mr. Morimoto is working hard to regain access to all other accounts, software, and services that Magu was locked out of.

68.    On or around March 8, 2025, Mr. Morimoto, when going through Magu's finances, discovered Mr. Kim used Magu's finances to purchase a gun and/or ammunition. Mr. Kim never informed Mr. Morimoto about this purchase and Mr. Morimoto was completely unaware of this charge until the time of this discovery, which caused both Mr. Morimoto and Mrs. Morimoto to be greatly concerned about their safety.

69.    Due to Mr. Kim's wrongful actions, Mr. Morimoto went through Magu's financial and business records and found that Mr. Kim had used Magu's company funds and incurred at least $40,230.42 in unauthorized amounts, both before and after Mr. Kim terminated their working business relationship, which included the ticket for the Acquistion.com marketing events, purchases of a new

graphics card and computer parts, software costs, marketing costs, purchases of a gun/ammunition, cash withdrawals, manufacturing costs, shipping costs, website costs, personal travel, CPA-related expenses, and other costs. These costs were incurred and purchases were made without Magu's or Mr. Morimoto's consent.

70.   Since the date of this Complaint, Mr. Kim still has access to all of Magu's social media accounts and continues to sell Magu's Products as FeelKALM's products, using the same packaging, labels, Magu's formulas, and Magu's Marks. Furthermore, Mr. Kim took over Magu's QR Generator account and changed the QR code link on all of Magu's packaging so that, when scanned, the QR Code would link to FeelKALM's website instead of Magu's website.

71.   On April 1, Mr. Morimoto and Mrs. Morimoto moved to Colorado for safety reasons, after discovering Mr. Kim used Magu's funds to purchase a gun and/or ammunition.

72.   On or about March 28, 2025, Mr. Kim began running certain advertisements that used the Mindhack product name, logo, and picture, alongside Magu's color scheme, and other Unregistered Marks, with phrases such as "Don't fall for copycats", "Get Mind Hack from the guy who created it", "KALM Mind Hack (formerly MAGU)", "Founded by the creator of Mind Hack", and "Top 2024 supplement" (FeelKALM was not created until 2025 so this statement is regarding Magu and its product), insinuating that Magu, the original company that created and owns Mindhack, and Mr. Morimoto, the original creator of Mindhack's formula, was a copycat and that Mr. Kim was the original creator of Mindhack and that FeelKALM owns Mindhack. Examples of these advertisements are attached hereto as **Exhibit E**.

73.   Since Mr. Kim has taken over Magu's social media channels and website, Mr. Kim and FeelKALM have willfully and intently disseminated and continue to disseminate digital online advertisements to promote their products, both in graphical and video formats, that contained false and misleading assertions

LimNexus LLP

regarding the creation and ownership of Magu's Products, the origin of FeelKALM's products, the validity of Defendants' manufacturing process, the herbs used as being "fresher quality", the formulas of FeelKALM's products are improved, the proper storage of the products, the research and development of the products, the efficacy of the products, the validity of customer feedback, and Magu allegedly diluting product with bad batches.

74.    Mr. Kim, individually and on behalf of FeelKALM, personally targeted and communicated with Magu's customers using predominantly text messages, emails, and other methods to solicit sales from them by informing them that the formulas for Magu's Products have been changed and improved and offering them specialized individualized discount codes to match or beat Magu's prices. Mr. Kim's and FeelKALM's aforementioned tactics, alongside their other wrongful actions described herein, have caused Magu to lose customers and sales and forced Magu to rematch the discounted prices in order not to lose any customers and sales. Due to their wrongful actions herein, many of Magu's customers expressed concerns over the situation, opted out of email communications from Magu, and either started purchasing Magu's Products from FeelKALM or refrained from purchasing any products from any party at all.

75.    As a result of Mr. Kim's wrongful actions described herein, Magu has lost and will continue to lose not only revenue, in the form of lost sales, sales that went to FeelKALM, at an estimated rate of $19,022.56 per week since Mr. Kim's takeover of Magu, cancelled subscriptions estimated to be at least one hundred of them, at least 15 stolen subscriptions, increased refunds which totaled to at least $1,255.33, and customers, but also, more importantly, Magu lost and will continue to lose the trust of its customers and its goodwill, and Magu's brand and reputation has been tarnished. Magu is forced to rebuild, regain the trust and goodwill it built with its customers, and save itself from the consequences of Mr. Kim's and

LimNexus LLP

1   FeelKALM's wrongful actions. Magu's filing of this Complaint is a crucial step in
2   that recovery process.

### FIRST CAUSE OF ACTION
### TRADEMARK INFRINGEMENT IN VIOLATION OF SECTION 32 OF
### THE LANHAM ACT

6   76.    Magu created certain trademarks in connection with its Products. These
7   trademarks include the registered Magu Word Mark. Magu applied for the Magu
8   Word Mark's registration on October 09, 2023, and Word Mark was registered on
9   November 26, 2024. Magu owns and has rights to use its federally registered Magu
10  Word Mark in connection with herbal supplements and nutritional supplements.

11  77.    Magu has used the Magu Word Mark since the inception of Magu's
12  business. The Magu Word Mark is the core of Magu's brand and business. Magu
13  continues to use the Magu Word Mark in commerce. As a result, these marks have
14  garnered good will and are associated with Magu and its Products.

15  78.    Magu's rights in the Magu Word Mark predates Defendants' first use
16  of the Magu Word Mark as FeelKALM as Defendants only used the Magu Word
17  Mark as FeelKALM after Defendant Mr. Kim ended his business relationship with
18  Magu.

19  79.    Defendants' use of the Magu Word Mark is for the same category of
20  products, herbal supplements and nutritional supplements, as Defendants' products
21  are exactly the same as Magu's Products Magu as Defendants are selling Magu's
22  inventory, including its original labels and packaging that use the Magu Word Mark,
23  that Magu gave to Defendant Mr. Kim while he was still working at Magu.
24  Although Defendants are using the name KALM, Defendants are still advertising
25  these products using the Magu Word Mark on its website such as in testimonials and
26  communications with customers and their customers are receiving Magu labeled
27  products. Since Defendants are selling Magu's products under a different name,
28  both Magu's goods and Defendant's goods are closely related and complimentary.

LIMNEXUS LLP

80.     Defendants' use of the Magu Word Mark is likely to cause confusion as to the origin, affiliation, or approval of the Products. In fact, Defendants have already caused confusion as both Magu's and FeelKALM's customers have contacted Magu expressing confusion over the Products. Customers are being led to believe that Defendants have either rebranded Magu and is selling on behalf of Magu, its Products, under a false name that Magu did not create or for those who were not familiar with Magu, led those customers to believe that the products were created by FeelKALM and not Magu. Either way, consumers could and have mistakenly believed that Magu's Products are properly being sold under FeelKALM or FeelKALM's products are not actually Magu's Products.

81.     Defendants chose to use the Magu Word Mark with actual knowledge as these were first created and used by Magu, which Defendant Mr. Kim was not a part of in their creation and implementation.

82.     Defendants' use of the Magu Word Mark was under the guise of an unauthorized rebrand and deprived Magu of the ability to control consumer perception of the Products and their quality and places Magu's valuable reputation and goodwill in Defendants' hands, over whom Magu has no control.

83.     Defendants' actions constitute federal trademark infringement in violation of 15 U.S.C. § 1117(a).

84.     Magu has been, is now, and will be irreparably harmed by Defendants' actions, and unless enjoined by the Court, Defendants will continue to infringe upon Magu's Magu Word Mark. There is no adequate remedy at law for the harm caused by the acts of infringement alleged herein.

85.     As a proximate result of Defendants' wrongful actions described herein, Magu has suffered significant damages, the total amount of which shall be determined by proof at trial.

## SECOND CAUSE OF ACTION

**COMPLAINT**

LIMNEXUS LLP

1
2

## FALSE ADVERTISING IN VIOLATION OF SECTION 43(a) OF THE LANHAM ACT

3       86.    Defendants' actions described herein are false and misleading

4  representations in commercial advertising which have harmed Magu.

5       87.    Defendants have made multiple false or misleading statements of fact

6  on FeelKALM's website, their communications with customers about Magu, and

7  their digital advertisements.

8       88.    Defendants are wrongfully claiming that Magu has rebranded into

9  FeelKALM and telling Magu's customers they have rebranded and had the intention

10 of continuing to sell these products under FeelKALM to current and prospective

11 customers of Magu.

12      89.    Defendants are willfully and intently disseminating digital online

13 advertisements, both in graphical and video formats, that contain false and

14 misleading assertions regarding the creation and ownership of Magu's Products,

15 including the framing of Magu and its Products being "copycats", the validity of

16 Defendants' manufacturing process, the herbs used as being "fresher quality", the

17 proper storage of the products, the research and development of the products, the

18 efficacy of the products, the validity of customer feedback, and Magu allegedly

19 diluting product with bad batches.

20      90.    These statements deceived or had the capacity to deceive a substantial

21 segment of potential consumers.

22      91.    The deception is material because it is likely to influence a consumer's

23 purchasing decision of when it comes to ordering the product from Magu's website

24 or FeelKALM's website.

25      92.    The statements were made through Defendants' website, social media,

26 and email newsletters to customers both in and outside of the state of California

27 which means they were made in interstate commerce.

28

LimNexus LLP

21

**COMPLAINT**

93.    The statements have injured Magu and will continue to injure Magu as Magu has lost sales to Defendant FeelKALM and has increased the number of refunds and cancellations of subscriptions.

94.    Magu has standing to bring this false advertising claim as Magu suffered harm as a result of Defendants' actions, the harm is traceable to and flows directly from Defendants' actions as shown through communications from consumers, and current and future injury would be redressed by a favorable decision to award damages to Magu and enjoin Defendants from making these false or misleading statements and advertisements Magu, its Products, FeelKALM, and its products based on Magu's Products. Furthermore, the injury is within the zone of interests protected by the Lanham Act as Magu's harm is related to its commercial interest in its reputation and sales.

95.    As a proximate result of Defendants' wrongful actions described herein, Magu has suffered significant damages, the total amount of which shall be determined by proof at trial.

## THIRD CAUSE OF ACTION
## FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION IN VIOLATION OF SECTION 43(a) OF THE LANHAM ACT

96.    Defendants' use of the Magu's Marks falsely suggested that its products have been properly created by, sponsored by, affiliated with, related to, and approved by Magu and its Products under the Magu's Marks.

97.    Defendants have taken Magu's inventory and sold it off under a different name, FeelKALM or KALM. Despite advertising the products under KALM, Defendants still maintained the use of Magu's Marks when selling Magu's Products as FeelKALM as Defendants directly sold Magu's Inventory, without even changing the label and packaging, under the guise of an unauthorized rebrand.

98.    Defendants have acted with knowledge of Magu's Marks as Defendant Mr. Kim assisted in the process of creating them. Magu applied for the Word

Mark's registration on October 09, 2023, and the Word Mark was registered on November 26, 2024.

99.    Defendant's unauthorized use of Magu's Marks is a reverse passing off of Magu's Products which constitutes false designation of origin and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

100.    As a proximate result of Defendants' wrongful actions described herein, Magu has suffered significant damages, the total amount of which shall be determined by proof at trial.

## FOURTH CAUSE OF ACTION

## UNREGISTERED TRADEMARK INFRINGEMENT IN VIOLATION OF SECTION 43(a) OF THE LANHAM ACT

101.    Magu created certain trademarks in connection with its Products. These trademarks include the word mark for White Sunrise, Mindhack, the mark for the Magu Tree, Magu's defining color combination scheme, and the trade dress the Products are sold in.

102.    Magu created these Unregistered Marks which were used in commerce. Magu has used these marks since the inception of Magu's business and the development and launch of its Products. The Magu Tree mark has been used in commerce since January 2023 when Magu was first formed. The White Sunrise mark has been used in commerce since May 2023 when that product first launched. The Mindhack mark has been used in commerce since December 2023 when that product first launched. Magu continued to use these Unregistered Marks in commerce. As a result, these marks have garnered good will and are associated with Magu and its Products. Therefore, Magu has an interest in these Unregistered Trademarks.

103.    Alongside being used in commerce, these Unregistered Marks are inherently distinctive as they are either arbitrary, fanciful, or suggestive. Thus, these Unregistered Marks are valid trademarks.

LimNexus LLP

104.    Magu's rights in these Unregistered Marks predates Defendants' first use of these Unregistered Marks as FeelKALM as Defendants only used these Unregistered Marks as FeelKALM after Defendant Mr. Kim ended his business relationship with Magu. Additionally, Defendants are operating in the same region of Southern California as Magu which is the primary territory where Magu has used these Unregistered Marks.

105.    Defendants' uses of these Unregistered Marks are for the exact same Products Magu has created but under the name of Kalm. Defendants are advertising these Products using these Unregistered Marks with the word KALM but in actuality are selling its customers the exact same Products, using the same packaging and Unregistered Marks, which were given to Defendant Mr. Kim while he was still working at Magu. Since Defendants are selling Magu's products under a different name, both Magu's goods and Defendants' goods are closely related and complimentary.

106.    Defendants' use of these Unregistered Marks is likely to cause confusion as to the origin, affiliation, or approval of the Products. In fact, Defendants have already caused confusion as both Magu's and FeelKALM's customers have contacted Magu expressing confusion over the Products. Customers are being led to believe that Defendants have either rebranded Magu and is selling on behalf of Magu, its Products, under a false name that Magu did not create or for those who were not familiar with Magu, led those customers to believe that the products were created by FeelKALM and not Magu. Either way, consumers could and have mistakenly believed that Magu's Products are properly being sold under FeelKALM or FeelKALM's products are not actually Magu's Products.

107.    Defendants chose to use these Unregistered Marks with actual knowledge as these were first created and used by Magu, which Defendant Mr. Kim was part of in their creation (except to White Sunrise) and implementation.

LimNexus LLP

108.   Defendants' use of Magu's Unregistered Marks, under the guise of an unauthorized rebrand, deprived Magu of the ability to control consumer perception of the Products and their quality and places Magu's valuable reputation and goodwill in Defendants' hands, over whom Magu has no control.

109.   Defendants' actions constitute federal unregistered trademark infringement in violation of 15 U.S.C. § 1125(a)(1)(A).

110.   Magu has been, is now, and will be irreparably harmed by Defendants' actions, and unless enjoined by the Court, Defendants will continue to infringe upon Magu's Unregistered Marks. There is no adequate remedy at law for the harm caused by the acts of infringement alleged herein.

111.   As a proximate result of Defendants' wrongful actions described herein, Magu has suffered significant damages, the total amount of which shall be determined by proof at trial.

## FIFTH CAUSE OF ACTION
## COMMON LAW TRADEMARK INFRINGEMENT

112.    By their acts alleged herein, Defendants have engaged in trademark infringement under the common law of the State of California.

113.   The general consuming public of California recognizes Magu's Marks as designating Magu as the source of goods and services. Magu has common trademark rights in the Magu's Marks under California law.

114.   Defendants' use of these Magu's Marks is likely to cause confusion as to the origin, affiliation, or approval of the Products. In fact, Defendants have already caused confusion as both Magu's and FeelKALM's customers have contacted Magu expressing confusion over the Products. Customers are being led to believe that Defendants have either rebranded Magu and is selling on behalf of Magu, its Products, under a false name that Magu did not create or for those who were not familiar with Magu, led those customers to believe that the products were created by FeelKALM and not Magu. Either way, consumers could and have

**COMPLAINT**

LimNexus LLP

mistakenly believed that Magu's Products are properly being sold under FeelKALM or FeelKALM's products are not actually Magu's Products as Defendants engaged in such wrongful conduct under the guise of an unauthorized rebrand.

115.    Defendants' wrongful activities in the State of California have caused Magu irreparable injury.

116.    Magu is informed and believes that unless said conduct is enjoined by this Court, Defendants will continue and expand those activities to the continued and irreparable injury of Magu. This injury includes a reduction in the distinctiveness of Magu's Marks and injury to Magu's reputation that cannot be remedied through damages alone, and Magu has no adequate remedy at law.

117.    Magu is entitled to a permanent injunction restraining and enjoining Defendants and their agents, employees, and all persons acting thereunder, in concert with, or on its behalf, from using in commerce the Magu's Marks or any colorable imitation thereof.

118.    Magu is also entitled to recover (i) Defendants' profits, (ii) Magu's ascertainable damages, and (iii) Magu's costs of suit.

119.    As a proximate result of Defendants' wrongful actions described herein, Magu has suffered significant damages, the total amount of which shall be determined by proof at trial.

## SIXTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY:
## FAILURE TO USE REASONABLE CARE
## AGAINST DEFENDANT MR. KIM

120.    Magu claims that they were harmed by Defendant Mr. Kim's breach of the fiduciary duty to use reasonable care.

121.    Defendant Mr. Kim was Magu's agent as he was Magu's corporate officer as he served as Magu's CEO and vice president as evidenced by his inclusion

LimNexus LLP

in Magu's prior statement of information before and in his email signature when he worked at Magu before he terminated his business relationship with Magu.

122.  As a corporate officer, Defendant Mr. Kim acted on behalf of Magu for purposes of developing marketing materials, including marketing copy on Magu's original website, in collaboration, assistance, and approval of Mr. Morimoto, maintaining Magu's original website which the domain is owned by Mr. Morimoto/Magu, handling the development of the majority of the graphic design and trade dress in collaboration, assistance, and approval of Mr. Morimoto, managing Magu's social media and content creation, fulfilling orders from customers, acting as the primary customer service representative, and leading the sales team.

123.  Defendant Mr. Kim failed to act as a reasonably careful corporate officer who would have acted under the same or similar circumstances.

124.  Magu was harmed when Defendant Mr. Kim took business away from Magu when Defendant began selling Magu's Products under FeelKALM to Magu's own customers, which resulted in loss of sales and increase in refunds and cancellations for Magu.

125.  Defendant Mr. Kim also misappropriated Magu's inventory and finances by making unauthorized purchases and incurring unauthorized costs for personal reasons which totaled at least $90,230.42, as calculated in the Ninth Cause of Action in this Complaint.

126.  Magu did not give Defendant Mr. Kim informed consent to engage in such conduct.

127.  Magu's business was harmed by customers being confused, cancelling subscriptions, and requesting refunds.

128.  Defendant Mr. Kim's conduct was a substantial factor in causing Magu's harm as without Defendant Mr. Kim engaging in this behavior, Magu would still operate under one name, avoid losses of revenue, subscriptions, and refunding

1  invoices, maintain its website and brand integrity, and not incur unauthorized costs

2  and charges.

3      129.   As a proximate result of Defendant Mr. Kim's wrongful actions

4  described herein, Magu has suffered significant damages, the total amount of which

5  shall be determined by proof at trial but is no less than $90,230.42.

6              **SEVENTH CAUSE OF ACTION**

7  **BREACH OF FIDUCIARY DUTY OF LOYALTY AGAINST DEFENDANT**

8                        **MR. KIM**

9      130.   Magu claims that it was harmed by Defendant Mr. Kim's breach of

10  fiduciary of loyalty. A corporate officer owes its corporation undivided loyalty.

11     131.   Defendant Mr. Kim was Magu's corporate officer when he was chosen

12  and accepted the position of Vice President and CEO.

13     132.   Defendant Mr. Kim knowingly acted against Magu's interest in

14  connection with the operations of the business by taking Magu's trade secrets and

15  establishing a rival "company" called FeelKALM that sold the exact same product

16  as Magu's, including the formula, packaging, and branding materials. Defendant

17  Mr. Kim further told Magu's customers that Magu was rebranding.

18     133.   Defendant Mr. Kim also misappropriated Magu's inventory and

19  finances by making unauthorized purchases and incurring unauthorized costs for

20  personal reasons as well as reasons for Defendant FeelKALM which totaled to at

21  least $90,230.42, as calculated in the Ninth Cause of Action in this Complaint.

22     134.   Magu did not give Defendant Mr. Kim informed consent to engage in

23  such conduct.

24     135.   Magu's business was harmed by customers being confused, cancelling

25  subscriptions, and requesting refunds.

26     136.   Defendant Mr. Kim's conduct was a substantial factor in causing

27  Magu's harm as without Defendant Mr. Kim engaging in this behavior, Magu would

28  still operate under one name, avoid losses of revenue, subscriptions, and refunding

LimNexus LLP

invoices, maintain its website and brand integrity, and not incur unauthorized costs and charges.

137.   As a proximate result of Defendant Mr. Kim's wrongful actions described herein, Magu has suffered significant damages which shall be determined by proof at trial but is no less than $90,230.42.

## EIGHTH CAUSE OF ACTION
## MISAPPROPRIATION OF TRADE SECRETS

138.   Magu claims that Defendants have misappropriated Magu's trade secrets.

139.   Magu owned the following trade secrets: the formulas of the Magu's "White Sunrise" and "Mindhack" health and nutritional supplements and Magu's customer list, including the confidential information of its customers.

140.   White Sunrise and Mindhack formulas and Magu's customer list were and still are trade secrets at the time of the misappropriation and this Complaint's filing.

141.   Defendants improperly used the trade secrets by selling the exact same Products under the brand name FeelKALM, using the same product names, labels, and packaging as they were part of Magu's inventory, and using Magu's customer lists to sell and advertise those products. Defendants passed off and sold the Products without Magu's consent. Defendants, at the time of use, knew that Defendant Mr. Kim's knowledge of Magu's trade secrets was acquired under the circumstances of being Magu's corporate officer, creating a legal obligation to limit his use of the trade secrets for Magu's purposes only.

142.   Magu was harmed and Defendants were unjustly enriched due to Magu losing sales, subscriptions, and issuing refunds and Defendants receiving revenue from sales and subscriptions regarding the Products they are passing off using the FeelKALM brand name, under the guise of an unauthorized rebrand.

LimNexus LLP

**COMPLAINT**

143.  Defendants' use of the trade secrets was a substantial factor in causing Magu's harm and Defendants becoming unjustly enriched as without Defendants taking the trade secret formula and customer list to produce their own version of Magu's Products and directly selling it to Magu's customers, Magu would not have lost sales, subscriptions, and issue refunds and Defendants would not have received revenue that Magu would have received if the customers bought the products through Magu instead of FeelKALM.

144.  As a proximate result of Defendants' wrongful actions described herein, Magu has suffered significant damages, the total amount of which shall be determined by proof at trial.

## NINTH CAUSE OF ACTION
## CONVERSION AGAISNT DEFENDANT MR. KIM

145.  Magu claims that Defendant Mr. Kim wrongfully exercised control of its personal property.

146.  Magu owned inventory of Products and a business bank account that contained funds to solely be used for business purposes.

147.  Defendant Mr. Kim substantially interfered with Magu's ownership of its inventory. Defendant Mr. Kim began selling Magu's inventory, in its original Magu labels and packaging, given to him by Magu by passing it off as his own under the rebranded name of FeelKALM, and KALM without Magu's consent. The estimated value, in terms of the revenue generated by the sales of the inventory Defendant Mr. Kim wrongfully converted, totals around $50,000 in retail value.

148.  Defendant Mr. Kim substantially interfered with Magu's business funds by knowingly and intentionally taking the possession of $5,575 out of the bank account and using it for paying his rent and living expenses and charging Magu's account for two payments of $6,250 for the unauthorized expense as part of the marketing training Defendant Mr. Kim wanted to attend. Magu did not agree to these charges.

149.   In addition to these costs, Defendant charged Magu's business account cost for additional unauthorized charges that Defendant used before terminating his business relationship with Magu and when he commandeered them for his use with FeelKALM. These costs included: the ticket for the Acquistion.com marketing events, purchases of a new graphics card and computer parts, software costs, marketing costs, purchases of a gun/ammunition, cash withdrawals, manufacturing costs, shipping costs, website costs, personal travel, CPA-related expenses, and other costs. The total amount of these costs was at least $40,230.42.

150.   Magu did not consent as Magu had no knowledge of these withdrawals until after Magu began an internal investigation into its finances after Defendant started to take control over Magu's accounts and website as Defendant did not notify Magu and sought Magu's approval.

151.   Magu was harmed as they lost the inventory FeelKALM sold and the funds Defendant withdrew from and charged to Magu's bank account.

152.   Defendant's conduct was a substantial factor in causing Magu's harm as but for Defendant's unpermitted passing off and selling of Magu's inventory and withdrawals, Magu would not have lost the $40,230.42 in unauthorized withdrawals and charges and $50,000.00 in lost inventory. Defendant was the one that took these unauthorized withdrawals and charges and was acting on behalf of himself not on behalf of Magu when taking out those withdrawals.

153.   As a proximate result of Defendant's wrongful actions described herein, Magu has suffered significant damages, the total amount of which shall be determined by proof at trial but is no less than $90,230.42 and any applicable interest accrued from the dates of conversion.

LimNexus LLP

1

**TENTH CAUSE OF ACTION**

2

**FALSE ADVERTISING IN VIOLATION OF CAL. BUS. & PROF. CODE §**

3

**17500 ET SEQ.**

4      154.    Defendants are wrongfully claiming that Magu has rebranded into

5    FeelKALM and telling Magu's customers they have rebranded and had the intention

6    of continuing to sell these products under FeelKALM to current and prospective

7    customers of Magu.

8      155.    Defendants are willfully and intently disseminating digital online

9    advertisements, both in graphical and video formats, that contain false and

10   misleading assertions regarding the creation and ownership of Magu's Products,

11   including the framing of Magu and its Products being "copycats", the validity of

12   Defendants' manufacturing process, the herbs used as being "fresher quality", the

13   proper storage of the products, the research and development of the products, the

14   efficacy of the products, the validity of customer feedback, and Magu allegedly

15   diluting product with bad batches.

16     156.    The statements were made through Defendants' website, social media,

17   and email newsletters to customers.

18     157.    These statements deceived or had the capacity to deceive a substantial

19   segment of potential consumers and the public.

20     158.    The deception is material because it is likely to influence a consumer's

21   purchasing decision of when it comes to ordering the product from Magu's website

22   or FeelKALM's website.

23     159.    The statements have injured Magu and will continue to injure Magu as

24   Magu has lost sales to Defendant FeelKALM and has increased the number of

25   refunds and cancellations of subscriptions.

26     160.    Magu has standing to bring this false advertising claim as Magu

27   suffered harm as a result of Defendants' actions, the harm is traceable to and flows

28   directly from Defendants' actions as shown through communications from

LimNexus LLP

**COMPLAINT**

consumers, and current and future injury would be redressed by a favorable decision to award damages to Magu and enjoin Defendants from making these statements and advertisements.

161.   As a proximate result of Defendant's wrongful actions described herein, Magu has suffered significant damages, the total amount of which shall be determined by proof at trial, for which Magu is entitled to a permanent injunction restraining and enjoining Defendant and its agents, employees, and all persons acting thereunder, in concert with, or on its behalf, from engaging in false or misleading advertising in connection with Magu, its Products, FeelKALM, and its products based on Magu's Products.

## ELEVENTH CAUSE OF ACTION

## UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200 ET SEQ.

162.   Defendants engaged in unlawful, unfair, and fraudulent business practices when they took Magu's trade secrets and Magu's Marks, developed, manufactured, and sold products using such trade secrets and trademarks, in direct competition with Magu as the new company FeelKALM, by selling to Magu's current, former, and prospective customers Defendants wrongfully obtained by taking Magu's customer list and publishing false and misleading advertisements on Magu's websites and social media accounts Defendants wrongfully took control over from Magu. Defendants engaged in additional unlawful, unfair, and fraudulent business practices when Defendants wrongfully converted Magu's inventory to sell and pass off as their own, infringed on Magu's trademarks, and conducted the other wrongful actions described herein. Defendants were able to do all of this under the guise of an unauthorized rebrand.

163.   Defendants' unlawful, unfair, and fraudulent business practices caused Magu harm and Defendants to be unjustly enriched. Without Defendants taking Magu's inventory, the trade secret formula to produce their own version of Magu's

LimNexus LLP

Products, and directly passing them off and selling them to Magu's customers using Magu's customer lists and false and misleading advertisements, Magu would not have lost sales, subscriptions, and issue refunds, and Defendants would not have received revenue that Magu would have received if the customers bought the products through Magu instead of FeelKALM.

164.    As a proximate result of Defendants' wrongful actions described herein, Magu has suffered significant damages, the total amount of which shall be determined by proof at trial.

## TWELFTH CAUSE OF ACTION
## UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA COMMON LAW

165.    Defendants engaged in unfair competition when they wrongfully converted Magu's inventory to sell and pass off as their own, and wrongfully used Magu's trade secrets and Magu's Marks to develop, manufacture, sell, and pass off as their own, under the guise of an unauthorized rebrand, Magu's products in direct competition with Magu as the new company FeelKALM, under FeelKALM or KALM name, by selling to Magu's current, former, and prospective customers Defendants wrongfully obtained by taking Magu's customer list and publishing false and misleading advertisements on Magu's websites and social media accounts Defendants took control over from Magu.

166.    Defendants' conduct falsely and deliberately stated that its products have been properly created by, sponsored by, affiliated with, related to, and approved by Magu.

167.    Defendants have acted with knowledge of Magu's Marks and trade secrets as Defendant Mr. Kim assisted in the process of creating them and/or had access to them as a former corporate officer and business partner.

LimNexus LLP

168.   Defendant's wrongful conduct is the reverse passing off of Magu's Products as Defendants' own through the deliberate misleading of consumers into which constitutes as unfair competition under California common law. Defendants' wrongful conduct has caused consumer confusion and Magu harm while Defendants became unjustly enriched.

169.   Without Defendants taking Magu's inventory, the trade secrets to produce their own version of Magu's Products, and directly passing them off and selling them, under the guise of an unauthorized rebrand, to Magu's customers using Magu's customer lists and false and misleading advertisements, Magu would not have lost sales, subscriptions, and issue refunds, and Defendants would not have received revenue that Magu would have received if the customers bought the products through Magu instead of FeelKALM.

170.   As a proximate result of Defendants' wrongful actions described herein, Magu has suffered significant damages, the total amount of which shall be determined by proof at trial.

### TWELFTH CAUSE OF ACTION
### COMMON COUNT

171.   Defendants began selling Magu's products under FeelKALM. Magu does not receive the proceeds of such sales as Defendants isolated those sales outside of Magu. As a result, Defendants would have an open book account in which financial transactions between them and their customers were recorded and that the revenue generated from Defendants' sales was due to their wrongful actions described herein and is the ascertainable damages owed to Magu.

172.   Magu requests the Court to order a full accounting of Defendants' books and records pertaining to the revenue generated from selling Magu's inventory under the name FeelKALM, KALM, or KalmHerbs.

### PRAYER FOR RELIEF

WHEREFORE, Magu prays for judgement and relief as follows:

LimNexus LLP

1.   A judgment for compensatory, consequential, incidental, special damages, and statutory damages, including damages pursuant to 15 U.S.C. § 1117, arising from Defendants' violation of the Lanham Act;

2. Entry of an order and judgment requiring Defendants and their officers, agents, employees, owners, and representatives, and all other persons, firms, or corporations in active concert or participation with them, be permanently enjoined and restrained from using any of Magu's Marks and trade secrets, selling Magu's Products as their own, doing any act or thing calculated or likely to cause confusion or mistake in the minds of members of the public, or current or prospective customers of Magu, with respect to the source of the products offered for sale, distributed, or sold by Defendants, or with regard to there being a connection between Defendants and Magu;

3. Entry of an order and judgment requiring Defendants and their officers, agents, employees, owners, and representatives, and all other persons, firms, or corporations in active concert or participation with them, to return any property belonging to Magu such as any remaining inventory of Magu's Products;

4. A judgment ordering Defendants, pursuant to 15 U.S.C. § 1116(a), to file with this Court and serve upon Magu within thirty (30) days after entry of the injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction and implemented adequate and effective means to discontinue doing business and offering or selling goods using Magu's Marks and trade secrets, as set forth above;

5. A judgment, pursuant to 15 U.S.C. § 1117, requiring that Defendants account for and disgorge to Magu all of the profits realized by Defendants or others in active concert or participation with Defendants, relating to the use of the

Magu's Marks and trade secrets, and, as the Court may deem appropriate, any additional amounts pursuant to 15 U.S.C. § 1117, plus interest;

6. A judgment ordering Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or show proof of said destruction or sufficient modification to eliminate all articles, signage, promotional items, literature, sales aids, packaging, or other materials and property in the possession, custody, or control of Defendants or its agents or distributors, bearing any mark confusingly similar to the Magu's Marks, both alone and in combination with other words or terms, and containing any trade secrets;

7. A judgment, pursuant to 15 U.S.C. § 1117, allowing Magu to recover its costs and attorneys' fees incurred in connection with this action;

8. A judgment requiring that Defendant pay pre- and post-judgment interest; and

9. A judgment granting Magu any relief that the Court deems just and proper.

Dated: May 5, 2025                    **LIMNEXUS LLP**

By: _____
Lisa J. Yang, Esq.
Yidu Sun, Esq.
Attorneys for Plaintiff.
MAGU CORPORATION, INC.

**COMPLAINT**

# EXHIBIT A

# United States of America

## United States Patent and Trademark Office

# MAGU

**Reg. No. 7,576,413**

**Registered Nov. 26, 2024**

**Int. Cl.: 5**

**Trademark**

**Principal Register**

MAGU CORPORATION  (CALIFORNIA CORPORATION)
2200 E ARTESIA BLVD
LONG BEACH, CALIFORNIA 90805

CLASS 5: Herbal supplements; Nutritional supplements

FIRST USE 1-00-2023; IN COMMERCE 1-00-2023

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 98-214,808, FILED 10-09-2023



*Katherine Kelly Vidal*

Director of the United States
Patent and Trademark Office



**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

# EXHIBIT B





Rigid Box Outside

Cutting Line:

Folding Line:

Bottom Panel

The FDA has not evaluated this product for safety or efficacy.

Made with patented technology and organic ingredients.

MOOD • EUPHORIA • MENTAL BALANCE •
FOCUS • EMOTIONAL REGULATION

FOR CALMING THE MIND

**PREMIUM HERBAL SUPPLEMENT**



# M A G U



# MAGU

## M I N D   H A C K

16 SERVINGS    •    NET WT 0.14 OZ (4 g)

**Things to try MAGU with:**

Protein Shake • Smoothies • Whipped Cream • Yogurt •
Apple Sauce • Ice Cream • Cheese • By Itself

Like other plants and herbs, MAGU is not water soluble.
MAGU will have the strongest effect when taken directly on the
tongue, but can be mixed with cold foods to reduce the taste.

# ONE BIG SCOOP.

# EVERY MORNING.

(It gets better with every scoop)

Do not skip your morning scoop. It may take up to 2 weeks to feel the MAGU magic.

Keep this box to hold your MAGU and spoon together.

For more information, scan the QR code.



Can't scan the QR code? *magucorp.com/biolink*
Need refills? *magucorp.com/refill*







PATENTED HEMP SUPPLEMENT

# MAGU
Natural Healing

32 SERVINGS      •      NET WT 0.28 OZ (8 g)

Flavor
WHITE SUNRISE

Batch Strength: 9.97%

Terpenes: alpha-Bisabolol, beta-Caryophyllene, Guaiol, alpha-Humulene

LOT CODE
EXP DATE

*These statements have not been evaluated by the Food and Drug Administrations. This product is not intended to diagnose, treat, cure, or prevent any disease.

MAGU SUPPLEMENT FOR *

WELL-BEING
MOOD
FOCUS

AA MAGU Corporation
Made in the USA, using domestically sourced ingredients from trusted farmers.

@magugrouporg

Manufactured by
MAGU Corporation
Fort Worth, Texas 76106

INGREDIENTS: Natural Hemp
MAY CONTAIN: Traces of pollen and chlorophyll

DIRECTIONS: Take 1 scoop daily at mealtime

SERVING SIZE: 1 scoop (.25g)

ES  20
TD  23

M A G U

MAGU

OUTSIDE

# EXHIBIT C

**Sale**

# Better Quality. Better Care.



New product images, coming soon...

**KALM Premium Supplement - Mind Hack**

~~$80.00~~ $59.99

# Mind Hack

## For calming the mind.

Physical Boost: ⭐⭐

Emotional Boost: ⭐⭐⭐⭐

Mental Boost: ⭐⭐⭐⭐

**Sale**

## Better Quality. Better Care.



New product images, coming soon...

### KALM Premium Supplement - White Sunrise

~~$100.00~~ $79.99 — or subscribe and save up to 10%

# White Sunrise

### For calming the body.

Physical Boost: ⭐ ⭐ ⭐
Emotional Boost: ⭐ ⭐
Mental Boost: ⭐

# EXHIBIT D



MAGU

ES TD

Flavor
**WHITE SUNRISE**

Batch Strength: 9.97%
Terpenes: alpha-Bisabolol, beta-Caryophyllene,
Guaiol, alpha-Humulene





Can't scan the QR code? **magucorp.com/biolink**
Need refills? ~~m~~ ~~iefill~~





# EXHIBIT E

1:04

   

ironmanny23   michael_angelo...   dmucetti1   laurenmolli...

kalmherbs ✔

...



♡ 2   💬 1   ✈

**kalmherbs** Don't fall for copycats. They'll never be as good as ours 😉

4 hours ago

7:01



**KALM**
Sponsored · 🌐

Ready to be the next success story? Use the link below or tap "Shop Now" to purchase. ⤵️

https://feelkalm.com/shop/mindhack/



    

